Our first case this morning is No. 23-1404, UniQure Biopharma B.V. v. Pfizer, Inc., Fleming. Good morning, and may it please the Court, Mark Fleming together with Natalie Morrissey and Emily Whalen on behalf of UniQure. I'd like to address two points this morning. First, a cursory mention of a hypothetical variant without any data, mechanism of action, or other promising information about it does not show a reasonable expectation that the human body would express it or that it would show clotting activity. And second, this is a case where, as this Court has said, objective indicia can be the most probative evidence of non-obviousness in the record. This field was and still is nascent and unpredictable. It was starved for a solution, yet despite knowing of Stafford and Shuttrumpf and Mano, nobody even made, much less tested, the leucine variant until Dr. Simeone came along. He showed the human body would express the leucine variant, that it had vastly more activity than the other options that the ART had tried, and that it would work with an adeno-associated viral vector. Nobody expected that. Everyone praised it. The field shifted to it, and it is the only FDA-approved gene therapy treatment for hemophilia B today. Unfortunately, the Board used Dr. Simeone's patent as a roadmap, or maybe a spotlight, to illuminate one option out of hundreds that the prior ART was not looking at. Is it your view that when we look at Stafford, and I believe this comes from people from the University of North Carolina, and Stafford says, I have three preferred embodiments. One of them is alanine, and the other is leucine, and then there's the third one. Are you saying that it has no evidentiary weight, or that a fact finder, just by virtue of this inventor declaring in a patent application that the inventor has three preferred embodiments, one of them identifying leucine, shouldn't be some indicia of what a person of ordinary skill in the ART would think about and consider as something with some expectation that it would work? I think the OSI case is very instructive in answering this question, Judge Chen. In OSI, the Schnur patent identified erlotinib as one of the preferred compounds for treating lung cancer. And then there was another reference, the 10K, that specifically said that erlotinib targeted non-small cell lung cancer. This court reversed the Board and said that was not substantial evidence because the references did not give any data or any indication as to how these compounds would supposedly work in fighting this disease. Stafford does name them. There's no question about that. But it doesn't say why it's naming them. It doesn't identify any mechanism. We're connecting multiple different pieces of evidence together. One is Stafford and its declaration of what its preferred embodiments are. Then there's, I guess, Dr. Peterson's testimony, building a bridge between R338A and R338L because of common properties and such. And we know R338A works very well. And then third is, I guess, the statement in your own patents, which talk about how there would be certain conservative substitutions. And it reads like there's an expectation that these kinds of conservative substitutions, they would work, and one of them being swap out the alanine for leucine. So when you combine all these things together, we're not just dealing with only one of them in isolation. It's the combination of everything that maybe pushes the ball forward and says, well, at least for a reviewing court, that counts as substantial evidence. So there's a lot in that question, Judge Chen. I want to try to address all three of them. Let's start with Stafford. And by the way, Stafford is the only prior art reference that we have here that even mentions leucine. I want to make sure that you understand that a core part of my question is not looking at these pieces of evidence alone, but more like it's a broader picture. When you put it all together, doesn't it create something that makes it hard for us to get over the substantial evidence standard arm to reverse here? Okay. Well, I want to address them individually because I think they individually have a number of problems that don't permit the kind of inference that you're talking about. I also want to make sure I get to objective indicia because it is precisely in this situation, when it may look like the prior art discloses a bunch of different points that just need to be connected, that how the art actually reacted in real life to these disclosures is particularly important. And I'm happy to start there if you'd like. And with respect to column four of the patent, I think it is, I mean, first of all, to the extent you can even look at Dr. Simeone's own disclosure, he certainly doesn't say that you could substitute out anything for position 338. And our expert, Dr. Spiegel, explained why. And that's because this... The patent identifies certain conservative substitutions, just a handful, and one of them being leucine. Well, it identifies certain properties that certain amino acids have in common, but it does not suggest that those substitutions would be permitted at all locations in the fixed protein, much less in this particular helix. And it cites the Bowie reference. And this is what Dr. Spiegel explains in detail in his declaration, and the board, we think, wrongly casts this aside, and I can explain why in a moment. But he explains, the Bowie reference itself says, and a skilled artisan would have recognized, that at some positions, particularly those that are heavily involved in protein function, which 338 is, it is heavily involved in the interaction between factor 9 and factor 8, which is critical to the clotting function. That is a place where no substitutions might be allowed. Let's remember also, column four calls out certain differences between alanine and leucine. Alanine has a short side chain, has the second shortest side chain of all of the amino acids. Leucine does not. It has a longer side chain. It is much bigger in size. It is more hydrophobic than alanine is. Dr. Spiegel explains this in paragraph 131 of his declaration, at 13367 of the appendix. The board disregarded this, not because it assessed the science and thought he was wrong on the science, but because they thought that he hadn't addressed the properties of alanine and leucine. Of course, he did that. He did that at length. We cite the passages in our brief, and I'm happy to direct your honor to them. It also thought that he didn't address the structure of factor 9 at all. That's also incorrect. He discussed that at length. If the board had properly considered, addressed, and found fault with the merits of Dr. Spiegel's evidence, we might be in a substantial evidence world. But I think we're in a world like PPC or like Provisor or like Vicor, where the board simply failed, for manifestly erroneous reasons, to even engage with the merits of the testimony that we put before it. Absent those errors, you mean? Not absent those errors. No, we think that even on the evidence that the board looked at, there's no substantial evidence, but there's at the very least... It sounds like an argument that you would make before the board, not so much like an argument that you'd make on appeal. No, Judge Dyke... You're just disagreeing with the conclusions that the board reached from the evidence. I don't think that's true, Judge Dyke, because the failure to even address the merits of the evidence that Dr. Spiegel gave at length in his declaration and in his deposition is an APA violation that this Court frequently reverses and remands, as it did in PPC, as it did in Provisor, if I'm pronouncing that correctly. The mischaracterization or the misunderstanding of a party's argument, the failure to consider all the evidence of record, is an APA error. Well, that's why I asked you that absent those supposed errors, you lose. But you're still arguing about the weight that the board gave the other evidence. I think we still have a substantial evidence appeal, the same as the one that succeeded in OSI, and that led to outright reversal of the board. OSI doesn't say that every time you're claiming a compound and there's an issue about prior art that the prior art has to show testing. It doesn't say that. We don't argue that, Your Honor. It doesn't have to show testing. If it doesn't have data, then it needs to show some kind of indication or mechanism of action that would permit a skilled artisan without hindsight, at the time of the prior art, not today, but at the time of the prior art, to extrapolate from whatever was known in the prior art to the claimed invention. The board concluded it was present here was the evidence that would allow you to extrapolate. Well, the board concluded, the board stated that, certainly, but there was no prior art evidence supporting it, just as there wasn't in OSI. And if the court isn't with me on this, then I would urge the court to look at the objective indicia. And I do want to hear you on that, but before you move on, I think I heard you say there's an APA violation. You raised lots of issues in your brief, but I don't know that I saw that one. Is that an issue in front of us? Yes, it's the failure to consider Dr. Spiegel's evidence, and we brief that at length in both our briefs. And you say that is a potentially reversible APA violation? Oh, absolutely. And we cite PPC, and we cite Proviser, and we cite Vicor, all the cases where this court has reversed and has remanded. Something about solvent exposure? Was that the point, that you didn't feel like the board addressed Dr. Spiegel's position about solvent exposure? That was an additional problem, and I'm happy to go to that. And Judge Stark, in answer to your question, the APA argument begins on the bottom of 33 of the blue brief and then is picked up again in the reply. So what is it that they ignored? They ignored Dr. Spiegel's evidence on the basis of two... What evidence? His explanation that the common physical properties that Pfizer was putting forward as supposedly linking alanine and leucine together were not properties that the prior art, that a skilled artisan before the priority date would have used to extrapolate or to conclude that the leucine variant would either express in the human body or that it would be active in promoting clotting and fighting hemophilia. That that was hindsight. And the reason it was hindsight is because there was nothing in any of the prior art references suggesting that any of these characteristics, being aliphatic, being hydrophobic, having a side chain of different lengths, that any of that was predictive of either expression or function. And he gives a number of counterexamples. Leucine, which I'm sure Mr. Grossman will say is a good helix former, if you put it at position 333, close by to the 338 position that's at issue here, it causes hemophilia because it's not active. There are a number of other substitutions at 338 itself and nearby disclosed in the Stafford reference that are not active or that don't express and therefore cause hemophilia. There are plenty of counterexamples that refute Dr. Peterson's theory and Dr. Spiegel lays this out in detail. He explains starting at 13359 how alanine and leucine differ and how that made it impossible to predict what leucine would do at 338. He explains in detail why the statement in column 4 about conservative substitutions is not inconsistent with our position because a skilled artisan would have read it in light of the Bowie reference which is cited. That's 13336 and 37 of the appendix. And he explains, Judge Chen, to the point, the question that you raised, that the 338 position is solvent exposed and because leucine is highly hydrophobic, much more hydrophobic than alanine, it would be counterintuitive for a skilled artisan to put leucine in there. The board said, well, Judge, Dr. Spiegel was wrong about that because there are two other leucines in the helix. But Pfizer's own reference, the Mathura reference, which we cited in our surreply and pointed out to the board, says that those two occur in hydrophobic pockets. That's page 1359. Dr. Spiegel's testimony. If we look at page 39 of the appendix, that's where the board swipes away Dr. Spiegel's testimony, 38 and 39. So it says, Dr. Spiegel's surface exposure opinion is undercut by Stafford's teaching that the 330, 338 region contains two solvent-exposed leucines. But we explained, by referring to the Mathura reference, that those leucines are in hydrophobic pockets. I'm not sure ultimately that that is disputed. The board didn't address that. And then separately, Dr. Spiegel, the board recognized the testimony. Where did the board mischaracterize his testimony? At the very top of 39, his opinion, so Dr. Spiegel, his opinions do not account for the knowledge of a person of ordinary skill in the art as to the properties of alanine and leucine and the structure of fix. He addressed both the properties of alanine and leucine and the structure of fix in great detail. And there is no engagement with it. The board, I don't know how they could reach this conclusion that he didn't account for it because just two pages earlier, in summarizing our case, they specifically explain that he testified that a skilled artisan would have considered, among other things, this is the middle of 37, that increased size and hydrophobicity of, they say an alanine variant, I think they mean a leucine variant, would negatively affect stability and solubility. And they specifically cite the pages of Dr. Spiegel's declaration, which is Exhibit 2101 at paragraphs 41 to 57 and then 131 to 35. So they knew the material was there. Can I move on to the secondary consideration? You're not arguing there's a nexus. We do argue that there's a nexus, most certainly. We don't argue there's a presumption of nexus, but we argue that we carried our burden to prove it. We do not argue a presumption. We never have argued a presumption of nexus. We argue that we proved a nexus. The board mistakenly held us to the standard, the higher standard for a presumption. The objective evidence goes to the merits of the invention. It absolutely does, Judge Chen, most certainly. It doesn't go to the leucine variant sitting in a dish somewhere. It goes to the recognition that Dr. Simeone had after he observed it in a human being, that it has significantly greater activity than anything else the prior art had tried, that it successfully expresses in the human body, and that it can therefore be used with an adeno-associated viral vector to treat hemophilia B. That is the complete invention. That is what was praised. That is what had unexpected results. Show me your best example of where that, your invention, was praised. Because it seemed to me like what was praised was the substitution, which is not your invention. So, well, it's part of the invention, obviously. It's claimed. But it's not commensurate with your invention. If you look at 12001, the Vandendriesche article specifically says the improvement in vector performance, vector performance, can be ascribed to the use of a modified transgene encoding a hyperactive mutant. It was putting it all together. The mutant used in a vector improved the vector. The Cancio and Nathwani paper on 13.817, this so-called Padua mutation has been shown to provide AAV vectors with enhanced potency. 12.196, Dr. Wang's 2019 study, their own expert, Padua mutation significantly improved the efficacy of gene targeting. It was putting them all together. I appreciate those sites. At 27, at the end of all of the survey, of the secondary consideration evidence, the board basically says, in any event, it's weak. Is there not substantial evidence? They didn't have to call it weak, but in the end they said it's weak. And we have to take a pretty deferential view of that assessment of that evidence. Why would we not say there's substantial evidence for the finding that it's weak? Because, first of all, there were legal errors that the board made on the way there. The first was holding us to the standard of a presumption. The second was wrongly thinking that our argument was inconsistent with a prior judgment on the board that rested on a disclaimer only and not on any merits. Pfizer doesn't even try to defend that. It's clearly a legal error, and it's manifestly prejudicial because they thought we were making an argument that the board had already rejected, which, of course, is not true. And third, the board erroneously thought we had to compare the unexpected results of Dr. Simeone's invention with supposed hypothetical results that did not exist in the prior art about the leucine variant by itself. That's the error that this court corrected in the Millennium case, where Millennium had claimed a mannitol ester of bortezomib, said this is much better than bortezomib, and the district court said, no, no, no, you had to compare it to the results from a glycerol ester because there was a reference that mentioned it as a possibility, even though it had never been tested in the prior art. And this court said, that's not correct. The patentee does not need to compare results to results that didn't exist in the prior art. You compare it to what was known. And the only results that were known in the prior art were the mannotesting of wild-type fix. Our results were eight to nine times better in terms of activity. And the shutrump test in mice of the alanine variant, ours were still better. That one was at most six times. And this was a test in... I appreciate the Court's attention. Thank you, Your Honor. Okay, Mr. Grossman. Good morning, Your Honors, and may it please the Court. On behalf of Apple Leaf Pfizer, we respectfully request that the Court affirm the findings of unpatentability of the Patent, Trial, and Appeal Board. I'd like to start with a colloquy that counsel had with Judge Dyke about whether this case is about substantial evidence and the arguments that Unicure is making here. The Board considered all of the evidence that Unicure is raising here. The Board rejected that evidence. Their arguments here are fundamentally not directed to is there a lack of substantial evidence. They're fundamentally directed to we think the Board should have found differently based on the evidentiary record, and there was no evidence to support its findings. Okay, but they're also arguing that there's some legal errors here, and I think it would be helpful if you addressed that argument. Sure. I think the one legal error that they point to... Well, they point to two. Oh, they point to one in connection with the prima facie case, the Spiegel testimony, and then they claim there were errors in connection with the assessment of the secondary consideration. Sure. So with respect to the consideration of Dr. Spiegel's testimony, they absolutely consider Dr. Spiegel's testimony. That is on pages 38 to 39 of the Board's decision of the appendix. As counsel pointed out, number one... They addressed all of Dr. Spiegel's testimony, and they correctly understand Dr. Spiegel's testimony. I believe they did. Those are the two arguments. I believe the Board is not required to address every single thing in 40 pages of Dr. Spiegel's testimony, but they did address the two key points that he made. One was whether or not there was any such thing as a conservative substitution in this context, and the Board flatly rejected that, number one, in light of the discussion in column four of the patent, and number two, in light of the Stafford reference, which highlights Alanine and Leucine as the most two preferred variants, and that reflects a conservative substitution. The other argument that they addressed of Dr. Spiegel's was whether the Leucine variant would express, and there was extensive evidence about why, based in part on this conservative substitution and the data for the Alanine variant, as Your Honor Judge Shen pointed to, that the Leucine variant would likewise be expected to express and to express at the same levels as the wild type. The issue about whether or not the Leucine would be solvent exposed, which the Board also addressed, is secondary to whether something would express or not, because whether or not something is solvent exposed only goes to the question of whether or not the Leucine variant would express, and the Board pointed to ample evidence as to why there would be a reasonable expectation here that the Leucine variant would, in fact, express. The Board rejected Dr. Spiegel's testimony on that because that was compared to a different protein. The argument about hydrophobic pockets was an argument, an attorney argument, that they made in Surapply, but I will add that the Board rejected that argument for two reasons. Well, they rejected the argument because Stafford itself said that the helix, where the Leucine is, is surface exposed, number one. And number two, as we pointed out in our briefing, Dr. Spiegel's testimony is directly contradicted by the testimony of Unicure's other expert, Dr. Doering, and this is at page 13721 of the record, where he said, quote, unquote, for factor IX, helix 338 is entirely solvent exposed, which directly contradicts this idea that there is any weight to be given to this potential hydrophobic pockets that my colleague was pointing to. So for purposes of the APA... There are even at the top of page 39 of the Board's decision that they mischaracterized Dr. Spiegel's testimony. What's your comment on that? I don't think they mischaracterized Dr. Spiegel's testimony at all. I think that they rejected Dr. Spiegel's testimony because Stafford said that there are two solvent-exposed Leucines, and they also rejected it, saying it lacks credibility because it was based on the protein hemoglobin S, which is not factor IX. So there is no APA... They say that Dr. Spiegel's opinions did account, that is they, your friends on the other side, they say Dr. Spiegel did account for the knowledge of a person of ordinary skill in the art as to the properties of alanine and leucine, and therefore the Board's statement at the top of 39 simply can't be defended. Well, I think the Board correctly rejected Dr. Spiegel's testimony in that regard. This is, I believe, on 38, if I may... At the top of 39. It's the end of the sentence. They're saying it's just a reversibly horrendous mischaracterization of Dr. Spiegel's testimony, and I want to understand your response to that. I think the response, and if I may, I think it actually goes back to the discussion of his testimony earlier on page 38, where they're talking about alanine and leucine. And what he is saying there is that there's no such thing as conservative substitutions. They rejected that on page 38, where he does not account for the knowledge of the skilled artisan, which begins on page 39, but it comes from the paragraph on 38. And what he was saying on 38 is, as they noted, there's no such thing as conservative amino acid substitutions here. And they did not find that credible in light of Stafford and other information, including the admission... Do you understand this statement by the board at the top of page 39 to be really getting at a conclusion that, in the board's view, Dr. Spiegel just did not wrestle with certain pieces of evidence of what would be the knowledge of a person of ordinary skill? I think that's... That's the problem. Not that Dr. Spiegel didn't account for any of the knowledge of a person of ordinary skill. I think that's a very fair characterization of the problem with Dr. Spiegel's testimony. Is this court ever trying to wrestle with a deeper explanation of what the law means when it requires a reasonable expectation of success? I mean, we all know it doesn't demand absolute predictability, but reasonable expectation of success can also be kind of a mushy, impressionistic kind of finding. And so I'm wondering, can you provide a little more insight on what you think reasonable expectation of success demands? I think a reasonable expectation of success has to be measured with respect to the claimed invention. I think that's obviously a fixed point of law. And the question then becomes... I don't know that the court has delved into the level of reasonableness required, if that's your Honor's question. I do think in the context of the examples that were given in both OSI and Strathclyde, there is an indicator here as the board found. There is, in the words of Strathclyde, evidence or promising information. There's even data in the form of the Alanine barrier. Where exactly that line is for how reasonable it needs to be, I couldn't cite a case for you for what that means. But I do think even under their cited cases, the standard is met here. And what I think they're really trying to argue at bottom is really rhetorically, how could it be... Would you agree it's harder to meet that standard in a recognized, unpredictable field of art? I think it depends on the information and the art. I think there are a lot of fields that are unpredictable and the court routinely finds inventions obvious because there was a reasonable expectation of success. And I will add here, and I think this is worth thinking about, because their unpredictability arguments are really about gene therapy. But in their reply, they actually effectively concede that gene therapy is not the issue. On page 8 of their reply, they say, finally, the board's statement that factor IX levels correlate well with clinical symptomology is not substantial evidence of a particular mutation's expected activity. It at most suggests that factor IX mutations known or reasonably expected to be active could have predictable clinical effects. Here, that is then taking... The clinical symptomology finding of the board, which they don't actually dispute, is well supported by substantial evidence, including the Hasbro reference statement of 1588, which was the basis for it. So it really comes back to this question of, would the board reasonably expect, or would the poster reasonably expect that the leucine variant would be active? And I think as the colleague we came out with, Your Honor, Judge Chen, and my colleague earlier, they keep trying to point to individual pieces of evidence without looking at the evidence as a whole. And the evidence as a whole here certainly supports, as the board found, that the poster would reasonably expect the leucine variant to be active, just as Stafford said it would be. And that then, once you move on to the clinical phase, makes this ample evidence of reasonable expectation of success. I just want to make sure I've sufficiently addressed the APA issue. What about their alleged errors in connection with the secondary consideration? Sure. I will say a couple of things about that. First of all, the board thoroughly analyzed all of the objective evidence that was presented and correctly found that no matter what standard was applied, whether it was coextensive or reasonably commensurate, it did not, there was not any nexus. And it further found, and this is why I think this is really a factual issue that they're trying to argue is a legal one, that any evidence of objective evidence, or any evidence of nexus was weak. And when they made that finding, they talked about how nexus, and this is under both the Rao case and the Merck CIE case, that nexus has to come from what's claimed and what's novel in the claim. And all of their evidence that they point to was really about the Factor IX variant. And I will add that the evidence from the Vandrisha reference at 12,001 that my colleague pointed to about vector performance, as we pointed out in our briefing, was about in vitro studies, in cells. It had nothing to do with a claim to use in humans, which is what they are talking about. And there's other evidence in that same article on pages 12,001 and 12,002 that the board cited to, so pointed that when it came to humans, there were a lot of variations that could impact the performance and the results in a clinical trial. And I will further note that on the question of objective evidence and the breadth of the claim, because this is something that I don't think they really engage with, the problem is they drew a massively broad claim. And as their own expert pointed out, there are thousands of AAV vectors, there are 10,000 promoters, and there are claims here, that claim one permits at least 70% amino acid identity. That's 30% changes, not even limited to conservative substitutions. And their evidence, which they try to say, oh, this goes out to the extent of AAV vectors, even if you credit that, and by the way, the board correctly found that AAV factor 9 was disclosed in the prior article, disclosed in Stafford, so that's also not new. But even if you were to credit that argument, they do nothing to deal with the breadth of the claims on promoters or the breadth of the claim on 70% identity. And in fact, their arguments about unexpected properties being commensurate with the scope of the claim is fundamentally contradicted by their own experts' arguments that there's no such thing as conservative substitutions here, and a single amino acid change can result in hemophilia. So there is no way here they could ever carry that burden, which is correctly why the board found it, and all of that was observed, which is why, by the board, in its discussion. Why would they ever get secondary consideration evidence to count in your view? Do they have to claim AAV5 all the way down to the last detail? I couldn't say exactly what they would need to claim, but it wouldn't be the claims that they have here, which are far too broad. I mean, if they wanted to claim... Well, let me maybe put it slightly differently, because my colleague did talk about Dr. Simeone's contribution here. Dr. Simeone found that the leucine variant existed in a human. He published an article about that in the New England Journal of Medicine. That is an interesting scientific finding worthy of publication. That is not worthy of a patent, and it's certainly not worthy of the patent that they have here, which is all they're doing is saying, oh, yeah, what Dr. Stafford published 10 years ago, now I'm going to say I'm going to try to claim that again. He did no gene therapy work. He relies on the MANO reference. That goes back to your question about predictability here. I mean, everything has to be based on what was in the prior art on gene therapy studies, which is presumably why they made that admission on page 8 of their reply brief, that this really isn't about the gene therapy, and it's just about, is a variant that is a conservative, structurally similar variant to something that was disclosed and shown to be active and is going to be reasonably expected to be active. And on that question, there is certainly substantial evidence to support the board's decision. To address 12,001, 13817 was also mentioned by Mr. Fleming as apparently industry praise of their invention. What's your response to that? I'd have to go look that up, but I believe that was also directed to the leucine variant. Is it your view that they presented no secondary consideration evidence that is commensurate with the scope of what was stated? I don't think they presented any evidence to show that what their evidence was, what was new in the claim. And the board correctly weighed that to show that it was weak. Okay. Thank you.  I only have a few minutes. Thank you, Your Honor. We didn't say there's no such thing as conservative substitutions. I would invite the court to look at 13335 paragraph 72. No, no. Well, 13335 paragraph 72. Here's what he said. To that end, particularly in the context of protein domains that are relevant to a protein's activity or specific interaction with a protein,  there is no such thing as conservative amino acid substitutions in the sense Dr. Peterson asserts. That's in no way inconsistent with what the patent says, and he goes on to explain why the 338 position in particular is relevant to protein activity and specific interactions with other proteins, namely the factor VIII protein. The board notes this on page 38. They recognize that Dr. Spiegel said substitution is context-dependent. They don't say that that's wrong. They just say that somehow he didn't account for the difference between alanine and leucine and the structure of fixed. He clearly did that. I don't think anyone can read his declaration starting at 13309, then again at 13335, 13341, and 13359. One cannot read those passages and those discussions and think he didn't account for them. If the board thought that he got something wrong on the science, it was incumbent on them to explain what. Judge Chen, regarding the standard which is what this court said in OSI, which is there either needs to be some data or there needs to be some indication or mechanism of action that permits someone to extrapolate that the experiment will work. And no basis. And then Dr. Peterson tried to build a bridge. A bridge in hindsight by looking at chemical properties that no one in the prior... Well, Stafford didn't mention the chemical properties. Stafford didn't say, you know, I expect these other ones to work. Remember, Stafford didn't even know why alanine worked. They counted to 1301. They tried to account for it. If Paul Barteson would look at Stafford and say what is going on here, why is Stafford contemplating alanine and leucine? Well, and they would have had no answer because they would also note that Stafford looked at valine and claimed that is preferred as well. I would urge the court, either now or in repose, to look at the chart on page 10 of the blue brief because that shows how the field was reacting to all this art in real time. This is a small... I think the court puts attention.